UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| DAVID DeBOARD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Cause No. 1:22-CV-396-HAB |
| | ) |
| VENTRY APARTMENTS, LLC, DOMO | ) |
| DEVELOPMENT COMPANY, LLC, | ) |
| SUNSTONE CONSTRUCTION | ) |
| COMPANY, LLC AND THE VENTRY | ) |
| APARTMENTS, LLC | ) |
| | ) |
| Defendants. | ) |

**OPINION AND ORDER**

Plaintiff is a serial "tester," searching Indiana for apartment complexes that violate the Fair Housing Act ("FHA") and suing when that search is fruitful. So it is here, as Plaintiff alleges that the Ventry Apartments ("Apartments") were not constructed or designed to accommodate tenants with disabilities. He seeks injunctive relief to bring the Apartments in compliance with the law, as well as compensatory and punitive damages, costs, and attorneys' fees.

Defendants The Ventry Apartments, LLC, joined by Domo Development Company, LLC and Sunstone Construction (collectively, the Defendants) move to dismiss the Complaint for lack of jurisdiction and failure to state a claim for relief. (ECF Nos. 23, 31, and 32). They claim that Plaintiff lacks standing to bring this suit. The parties have fully briefed the issue. (ECF Nos. 23, 30, 33). Because the Court finds that Plaintiff fails to allege a concrete and particularized injury in the wake of *TransUnion LLC v. Ramirez*, 141 S.Ct. 2190 (2021), he lacks Article III standing to sue. This Court lacks jurisdiction and Plaintiff's suit must be dismissed.

**I.      Factual Allegations**

Plaintiff is a "handicapped individual that uses a wheelchair." Plaintiff alleges that he "recently visited"[1] the Apartments and "observed and encountered accessibility barriers that would interfere with his ability to access and use the facilities." (Compl., ECF No. 1, ¶22). A non-exhaustive list of these barriers included in the Complaint are: inaccessible routes to some first floor units, to the dog park, and to the mailboxes; excessively steep slopes and cross-slopes in the accessible routes to some buildings "making it difficult for individuals using wheelchairs or mobility aids to safely move about" (*Id.* ¶29(g)); the absence of wheel-stops in the parking areas; and the failure to "design and/or construct doors to allow passage into and within all premises within such dwellings that are sufficiently wide to allow passage by handicapped persons in wheelchairs." (*Id.* ¶30).

Plaintiff alleges that he has been "injured by the Defendants' discriminatory practices and failure to design and/or construct apartments with accessible and usable features for people with disabilities as required by the FHA. These injuries arose from encountering discriminatory barriers at the" Apartments.

In their motion, Defendants assert that Plaintiff lacks standing under Article III, §2 of the Constitution to bring his claim in federal court. They argue that Plaintiff never applied for or requested to rent any housing from Defendants and that he is not a person entitled to bring a cause of action under the FHA. It is undisputed that Plaintiff does not allege or argue that he had any intention of renting a unit at the Apartments. Instead, this is one of at least *sixty* lawsuits filed by Plaintiff in an Indiana federal court since 2013 alleging violations of the FHA.

**II.     Legal Discussion**

---

[1] Defendants argue that the Complaint fails to state a claim because it does not provide the exact date of the alleged violations and a complaint under the FHA must be filed within 180 days of the discriminatory incident. Given the resolution of the standing question, the Court need not decide this issue.

A.      *Standard for Motions under Rules 12(b)(1) and 12(b)(6)*

On a motion to dismiss under Rule 12(b)(6), the Court accepts the complaint's well-pleaded factual allegations, with all reasonable inferences drawn in the non-moving party's favor, but not its legal conclusions. *See Smoke Shop, LLC v. U.S.*, 761 F.3d 779, 785 (7th Cir. 2014). The allegations, however, must "give the defendant fair notice of what the...claim is and the grounds upon which it rests," and the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and quotation marks omitted). Stated differently, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (internal citation and quotation marks omitted). To be facially plausible, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

The Defendants also move to dismiss the complaint for lack of subject matter jurisdiction. "Motions to dismiss under Rule 12(b)(1) are meant to test the sufficiency of the complaint, not to decide the merits of the case," and "[i]n the context of a motion to dismiss for lack of subject matter jurisdiction, [the court] accept[s] as true the well pleaded factual allegations, drawing all reasonable inferences in favor of the plaintiff[.]" *Center for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588 (7th Cir. 2014). That said, "a plaintiff faced with a 12(b)(1) motion to dismiss bears the burden of establishing that the jurisdictional requirements have been met." *Id.* at 588-89.

Further, the Court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists. *Evers v. Astrue*, 536 F.3d 651, 656-57 (7th Cir. 2008). "When subject-

matter jurisdiction—which is to say, the power to hear and decide the case at all—is at stake, a district judge may resolve factual disputes and make any findings necessary to determine the court's adjudicatory competence." *Craftwood II, Inc. v. Generac Power Sys., Inc.*, 920 F.3d 479, 481 (7th Cir. 2019).

**B.     *Plaintiff does not, and cannot, Plead an Injury Necessary for Article III Standing***

Plaintiff is an unusual, but not unique, civil rights claimant. He is best described as a tester; an individual "who, without an intent to rent or purchase a home or apartment, pose as renters or purchasers for the purpose of collecting evidence of unlawful . . . practices." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982). For the last four decades, both the United States Supreme Court and the Seventh Circuit have recognized the ability, and standing, of testers to sue under the FHA.

But those two score years came before *TransUnion*. There, the Supreme Court emphasized that, for Article III standing, a plaintiff must have a "concrete" injury. While *TransUnion* did not expressly overrule cases granting standing to testers, the Court sees no way to reconcile the harms associated with tester plaintiffs and the standing requirements in *TransUnion*. As demonstrated below, the injury allegedly suffered by Plaintiff is no longer enough to confer standing in federal court.

**1.     *Traditional Notions of Tester Standing***

Tester standing was first recognized by the Supreme Court in *Havens*.[2] In *Havens*, two testers, one white and one black, each called an apartment complex in Virginia and asked whether any apartments were available. The white tester was correctly told that apartments were available;

---

[2] Plaintiff cites *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91 (1979), as further support for standing. But the plaintiffs in *Gladstone* abandoned their tester theory of standing before the Supreme Court, and the Supreme Court did "not reach this question." *Id*. at 111.

the black tester was told the opposite. Both sued, claiming that the defendant had engaged in "racial steering" in violation of § 804 of the FHA. *Havens*, 455 U.S. at 366–68.

Discussing standing, the Supreme Court noted that the relevant statute, 42 U.S.C. § 3604(d), "establishes an enforceable right to truthful information concerning the availability of housing." *Id*. at 373. Relying on this congressional intent, the Court held that "[a] tester who has been the object of a misrepresentation made unlawful under [§ 3604(d)] has suffered injury in precisely the form the statute was intended to guard against, and therefore has standing to maintain a claim for damages under the Act's provisions." *Id*. at 373–74. Because the black tester received inaccurate information, she "alleged injury to her statutorily created right to truthful housing information," and had standing. *Id*. at 374. Because the white tester received accurate information, he "alleged no injury to his statutory right," and did not have standing. *Id*. at 375.

The Seventh Circuit recognized *Havens* in *Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521 (7th Cir. 1990). There, a village, a "nonprofit corporation that promotes integrated housing," and twenty-eight couples acting as testers sued a realty company, its owner, and its employees for racial steering of minority buyers to primarily minority areas.

The Seventh Circuit described tester standing as "dubious" because "they suffer no harm other than that which they invite in order to make a case against the persons investigated." *Id*. at 1526. But the Seventh Circuit recognized that *Havens* "holds that a tester to whom a real estate agent makes a misrepresentation forbidden by 3604(d) has standing to complain about the misrepresentation, because the statute creates a right to be free from such misrepresentations." *Id*. Finding that *Havens* controlled, the Seventh Circuit held that the testers had standing because they "were treated in a racially discriminatory fashion, even though they sustained no harm beyond the

5

discrimination itself, just as testers are not fooled by the misrepresentations made to them." *Id*. at 1527.

*Kyles v. J.K. Guardian Sec. Srvs., Inc.*, 222 F.3d 289 (7th Cir. 2000), explored the outline of tester standing. There, two black women sued under Title VII and 42 U.S.C. § 1981 after they were denied employment. While not an FHA case, the Seventh Circuit discussed FHA tester standing extensively by analogy. Discussing *Havens* and *Dwivedi*, the Seventh Circuit recognized that "it is now well established in this circuit that testers who experience housing discrimination suffer a cognizable injury that gives them standing to sue for a variety of Fair Housing Act violations." *Id*. at 297. Applying that case law to Title VII, the Seventh Circuit held:

> When Congress made it unlawful for an employer "to limit, segregate, or classify his employees or applicants in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee ... because of such individual's race....," it created a broad substantive right that extends far beyond the simple refusal or failure to hire. When a job applicant is not considered for a job simply because she is African–American, she has been limited, segregated or classified in a way that would tend to deprive not only her, but any other individual who happens to be a person of color, of employment opportunities. In other words, she suffers an injury "in precisely the form the statute was intended to guard against," just as she would if, as a housing tester, she were falsely informed that a vacant apartment was unavailable. She therefore has standing to sue, even if she has not been harmed apart from the statutory violation—even if, for example, she was not genuinely interested in the job she applied for and in that sense was not harmed by the employer's refusal to hire her.

*Id*. at 298 (citations omitted).

**2.**     TransUnion *and the Limits on Standing*

*TransUnion* focused on "the Article III requirement that the plaintiff's injury in fact be 'concrete'—that is, 'real, and not abstract.'" *TransUnion*, 141 S.Ct. at 2204, quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). "Concrete" injuries can be both tangible and intangible. On the intangible side, the Supreme Court recognized "reputations harms, disclosure of private

6

information, and intrusion upon seclusion," as well as "harms specified by the Constitution itself." *Id*.

How does one determine whether an injury is concrete enough? Courts "must afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation." *Id*. But Congress' say-so is not enough, because "it may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *Id*. at 2205.

Indeed, if *TransUnion* is remarkable for anything it is the decision's clear statements that a statutory cause of action alone does not create Article III standing. The Court rejected the idea that "a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id*., quoting *Spokeo*, 578 U.S. at 341. Instead, "Article III standing requires a concrete injury even in the context of a statutory violation." *TransUnion*, 141 S.Ct. at 2205.

> For standing purposes, therefore, an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law. Congress may enact legal prohibitions and obligations. And Congress may create causes of action for plaintiffs to sue defendants who violate those legal prohibitions or obligations. But under Article III, an injury in law is not an injury in fact. Only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court. As then-Judge Barrett succinctly summarized, "Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions."

*Id*. (citations omitted).

As the Court explained, the issue is ultimately one of separation of powers.

7

> A regime where Congress could freely authorize unharmed plaintiffs to sue defendants who violate federal law not only would violate Article III but also would infringe on the Executive Branch's Article II authority. We accept the displacement of the democratically elected branches when necessary to decide an actual case. But otherwise, the choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch, not within the purview of private plaintiffs (and their attorneys). Private plaintiffs are not accountable to the people and are not charged with pursuing the public interest in enforcing a defendant's general compliance with regulatory law.

*Id*. at 2207.

**3.**   *Plaintiff's Tester Standing is Incompatible with* TransUnion

When the Court compares the described harms in *Havens*, *Dwivedi*, and *Kelly*, it cannot conclude that testers in Plaintiff's shoes have standing under *TransUnion*. The language used in the tester cases, which imagine injury as the statutory violation itself, are plainly inapplicable post-*TransUnion*. Otherwise, *TransUnion*'s clear distinction between an injury in law and an injury in fact would be meaningless. There simply must be more than the fact of a violation, even where the statute expressly provides for a private cause of action, for Article III standing to exist.

Plaintiff does little to explain how his cause of action can survive *TransUnion*. He correctly notes that *TransUnion* recognized some intangible harms as concrete, and further points to *TransUnion*'s citation to *Allen v. Wright*, 468 U.S. 737 (1986), as evidence that discriminatory treatment is one of those intangible harms. But a review of *Allen* demonstrates the limited nature of standing arising out of even patent discrimination.

*Allen* involved a suit claiming that the IRS had failed to adopt standards and procedures to ensure that tax-exempt status was not awarded to racially discriminatory private schools. None of the class members bringing the claim alleged that their children had been victims of discriminatory exclusion, or even that they would apply to a private school. Instead, the plaintiffs claimed, "a direct injury from the mere fact of the challenged Government conduct and, as indicated by the

restriction of the plaintiff class to parents of children in desegregating school districts, injury to their children's opportunity to receive a desegregated education." *Id*. at 746.

The Supreme Court found that neither allegation conferred standing.[3] For the "mere fact" argument, the Supreme Court interpreted the allegation two ways. "It might be a claim simply to have the Government avoid the violation of law alleged in respondents' complaint. Alternatively, it might be a claim of stigmatic injury, or denigration, suffered by all members of a racial group when the Government discriminates on the basis of race. Under neither interpretation is this claim of injury judicially cognizable." *Id*. at 753–54.

The Court noted its repeated holdings that "an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court." *Id*. at 754. Standing, then, is not conferred by a mere violation of the law. Nor did the Court conclude that abstract stigmatic injury could suffice, as stigma "accords a basis for standing only to 'those persons who are personally denied equal treatment' by the challenged discriminatory conduct." *Id*. at 755, quoting *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984). The Court later explained, in a footnote, the circumstances in which stigmatic injury might give rise to standing.

> Respondents' stigmatic injury, though not sufficient for standing in the abstract form in which their complaint asserts it, is judicially cognizable to the extent that respondents are personally subject to discriminatory treatment. *See Heckler v. Mathews*, 465 U.S. 728, 739–740, 104 S.Ct. 1387, 1395–1396, 79 L.Ed.2d 646 (1984). The stigmatic injury thus requires identification of some concrete interest with respect to which respondents are personally subject to discriminatory treatment. That interest must independently satisfy the causation requirement of standing doctrine.
>
> In *Heckler v. Mathews*, for example, the named plaintiff (appellee) was being denied monetary benefits allegedly on a discriminatory basis. We specifically pointed out that the causation component of standing doctrine was satisfied with respect to the claimed benefits. In distinguishing the case from *Simon v. Eastern Kentucky Welfare Rights Org*., 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976),

---

[3] The Supreme Court addressed the second alleged injury under a causation analysis that has little application here. *Id*. at 756–61.

> we said: "there can be no doubt about the direct causal relationship between the Government's alleged deprivation of appellee's right to equal protection and the personal injury appellee has suffered—denial of Social Security benefits solely on the basis of his gender." 465 U.S., at 741, n. 9, 104 S.Ct., at 1396, n. 9.
>
> In this litigation, respondents identify only one interest that they allege is being discriminatorily impaired—their interest in desegregated public school education. Respondents' asserted stigmatic injury, therefore, is sufficient to support their standing in this litigation only if their school-desegregation injury independently meets the causation requirement of standing doctrine.

*Id*. at 757, n. 22. Even in the discrimination context, then, it is not enough for standing that discrimination occurs, or that the putative plaintiff knows that it is occurring. Instead, only someone who has experienced a concrete injury **because of** the discrimination has standing to sue in federal court. To hold otherwise would turn the federal courts into "no more than a vehicle for the vindication of the value interests of concerned bystanders." *Id*. at 756, quoting *United States v. SCRAP*, 412 U.S. 669, 687 (1973).

To the Court's knowledge, the Seventh Circuit has not addressed tester standing post-*TransUnion*. But at least one circuit court has. In *Laufer v. Arpan, LLC*, 29 F.4th 1268 (11th Cir. 2022), a professional tester like Plaintiff sued a hotel operator under the ADA alleging that the hotel's website lacked required accessibility features. The Eleventh Circuit compared its own precedent, *Sierra v. City of Hallandale Beach*, 996 F.3d 2220 (11th Cir. 2021), where that court concluded that a deaf plaintiff's stigmatic injury from being unable to understand city-produced videos satisfied Article III standing requirements, to *TransUnion*, ultimately concluding that standing existed.

The Eleventh Circuit held that there were two ways to understand *Sierra*. The first reading "suggests that concrete injury exists *whenever* an individual experiences illegal discrimination, regardless of whether she suffers any discernible adverse effects." *Laufer*, 29 F.4th at 1274. The

court found that, "for better or worse," *TransUnion* no longer permitted such a view. *Id*. at 1273–74.

But the Eleventh Circuit believed that there was a "narrower reading" that survived *TransUnion*. That reading would find that "humiliation, embarrassment, and frustration" are concrete and particularized injuries for Article III. *Id*. at 1274. In so finding, the Eleventh Circuit relied on *TransUnion*'s citation to *Allen*, discussed above. *Laufer* ultimately held:

> Because [Laufer] claims not only that she suffered illegal discrimination but also that the discrimination resulted in "frustration and humiliation" and a "sense of isolation and segregation," she has adequately pleaded a concrete stigmatic injury. And because her emotional injury is *her* emotional injury, it affects her "in a personal and individual way" and is therefore sufficiently particularized.

*Id*. at 1274–75 (original emphasis).

The Court isn't buying what *Laufer* is selling. The Court first notes the tension between the holding in *Laufer* and its observation, only pages earlier, that "Laufer's alleged injury—her inability to access certain information on a hotel's website and her resulting emotional disquiet— bears no 'close relationship' to any traditional common-law cause of action." *Id*. at 1272. *Laufer* describes the historical analysis as the first of multiple analyses for finding a concrete harm, but the Court's not so sure.

Nearly the entirety of *TransUnion*'s analysis of its plaintiffs' substantive claims focused on whether a historical analogue existed. *See TransUnion*, 141 S.Ct. at 2208 ("The plaintiffs argue that the publication to a third party of a credit report bearing a misleading OFAC alert injures the subject of the report. The plaintiffs contend that this injury bears a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts—namely, the reputational harm associated with the tort of defamation."); 2209 ("The 1,853 class members therefore suffered a harm with a 'close relationship' to the harm associated with the tort of

11

defamation."); *id*. ("And there is no historical or common-law analog where the mere existence of inaccurate information, absent dissemination, amounts to concrete injury."); 2213 ("But the plaintiffs have not demonstrated that the format of TransUnion's mailings caused them a harm with a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts."); 2214 ("For its part, the United States as amicus curiae, but not the plaintiffs, separately asserts that the plaintiffs suffered a concrete "informational injury" under several of this Court's precedents."). The Court does not find, then, that the Eleventh Circuit could hand-waive away the lack of a historical analogue for tester standing merely by relying on its own precedent.

But even if it could, it's hard to see how *Plaintiff's* claim survives. Plaintiff does not allege that he was humiliated, frustrated, or embarrassed by the conditions at the Apartments. For someone who seemingly does this for a living, such allegations would strain the limits of credulity. Instead, he pleads only the violation of the statute itself as injury; "Plaintiff has been injured by the Defendants' discriminatory practices and failure to design and/or construct apartments with accessible and useable features for people with disabilities as required by the FHA." (Compl. ¶26). Even under *Laufer*, then, Plaintiff's claim is foreclosed.

The Court does not hold that *all* tester standing was abrogated by *TransUnion*. But at least for testers like Plaintiff, who rely on a statutory violation alone to support their claims of standing, *TransUnion* changed the landscape. Plaintiff has failed to allege a particularized, concrete injury that would give this Court jurisdiction over his claim. It must be dismissed.

### III.   Conclusion

For these reasons, the Defendants' Motions to Dismiss (ECF Nos. 23, 31 and 32) are GRANTED. This case is DISMISSED for lack of jurisdiction.

SO ORDERED on June 22, 2023.

                                                          s/ *Holly A. Brady*  
                                                          JUDGE HOLLY A. BRADY  
                                                          UNITED STATES DISTRICT COURT